922 P.2d 371

In the Matter of the Tax Appeal of William **WEINBERG,** successor in interest of WKH Corporation, a dissolved corporation, formerly d.b.a. Kahala Hilton Hotel, **Appellant–Appellant,**

v.

**CITY AND COUNTY OF HONOLULU,** Appellee–Appellee.

No. 18562.

Supreme Court of Hawai'i.

July 23, 1996.

As Amended on Partial Grant of Reconsideration Sept. 3, 1996.

Robert B. Bunn and Carlito P. Caliboso of Cades Schutte Fleming & Wright, on the briefs, Honolulu, for appellant-appellant.

Gregory J. Swartz, Deputy Corporation Counsel, on the briefs, Honolulu, for appellee-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Appellant-appellant William Weinberg, the successor in interest of the now-dissolved WKH Corporation (formerly doing business as the Kahala Hilton Hotel) appeals from the tax appeal court's judgments upholding the real property tax assessments by appellee-appellee City and County of Honolulu (the City) for the tax years 1991 and 1992. Weinberg's consolidated tax appeals challenged the City's land value assessment of the property known as the Kahala Hilton Hotel.

The four issues raised by Weinberg in this appeal essentially involve the tax appeal court's rulings regarding the admissibility of, and the weight given to, certain evidence used to establish the value of the land. We affirm.

## I. BACKGROUND

The Kahala Hilton Hotel is situated on 6.485 acres of land leased from the trustees under the Will and of the Estate of Bernice Pauahi Bishop (Bishop Estate). Prior to the City's assessment of the property in 1991 and 1992, the existing thirty-year lease between fee owner Bishop Estate and lessee WKH Corporation was due to expire on October 31, 1990. Pursuant to the lease terms relating to renegotiation of the lease rent, the annual lease rent for the ten-year period beginning November 1, 1990 would be set by agree-

ment of the lessee and Bishop Estate. If the parties could not reach an agreement, the annual lease rent would be set, by appraisal and binding arbitration, at six percent of the then-market value of the property, exclusive of improvements thereon. The lease provided that the market value determined by the arbitrators, or by a majority of them, would be final, conclusive, and binding.

WKH Corporation offered Bishop Estate $1,200,000 in annual rent based on its land valuation of $20,000,000. Bishop Estate, however, sought $18,000,000 in annual rent based on its land valuation of $300,000,000. Because the parties could not agree on the new annual lease rent, the matter was submitted to binding arbitration, pursuant to the terms of the lease.

On August 13, 1992, after hearing five days of testimony, a three-member arbitration panel comprised of arbitrators John J. Hulten, Sr., Nicholas Ordway, Ph.D., and Tan Tek Lum, determined that, as of November 1, 1990, the market value of the property, exclusive of improvements, was $93,350,000. Arbitrator Hulten testified before the tax appeal court that, during the arbitration proceeding, he believed that the market value was between $30,000,000 and $73,000,000. However, he agreed to the $93,350,000 valuation because he believed that, if he did not agree, arbitrator Lum would agree to a value in the high end of Ordway's valuations, which ranged from $80,000,000 to $121,000,000. The record indicates that arbitrator Lum dissented from the panel's decision, stating that he had determined the market value to be $155,000,000, or at minimum, $121,000,000.

The compromise arbitration valuation of $93,500,000 resulted in an annual lease rent of $5,601,000 (six percent of $93,350,000). On December 1, 1992, the circuit court granted Bishop Estate's motion to confirm the arbitration award and denied WKH Corporation's motion to vacate the award. Subsequently, WKH Corporation timely appealed from the circuit court's confirmation order. During the pendency of the appeal, WKH Corporation prepared to file for bankruptcy. Because the Kahala Hilton Hotel "could not exist and pay that rent," WKH Corporation also attempted negotiations with Bishop Es-

tate to work out a lower lease rent that would allow the Kahala Hilton Hotel to continue its operations.

The negotiations resulted in a Letter Agreement between Bishop Estate, WKH Corporation, and the prospective purchasers of the Kahala Hilton Hotel, Bill Mills Development Company, Inc. and Tokyo General Corporation. Pursuant to the Letter Agreement, Bishop Estate agreed to, *inter alia*, lower the annual lease rent of $5,601,000 to $1,200,000 plus a percentage of the annual gross income (after deductions of base rent, real property taxes, and other items). The percentage rates were fixed as follows: (1) no percentage rent for the first two years; (2) three percent for the next eight years; and (3) five percent thereafter. The lease term was also extended from ten years to forty years. According to Nathan Aipa, counsel to Bishop Estate, the objective of the new lease terms was to yield the economic equivalent of $5,601,000 in annual rent. In turn, WKH Corporation agreed to, *inter alia*, sell the Kahala Hilton to Bill Mills Development Company, Inc. or Tokyo General Corporation, which would undertake Bishop Estate-approved capital improvements of not less than $30,000,000 to "repair, refurbish, upgrade[,] and enhance" the hotel.

On October 27, 1993, WKH Corporation distributed its interest in the Kahala Hilton Hotel to Weinberg, its sole stockholder. Weinberg, in turn, sold his interest in the Kahala Hilton to Bill Mills Development Company, Inc., which immediately resold it to the Kahala Hotel Associates Limited Partnership, an entity controlled by Tokyo General Corporation. The final adjusted sales price for the Kahala Hilton Hotel was $53,750,000.

The day after the sale, WKH Corporation's appeal from the circuit court's order confirming the arbitration award was dismissed with prejudice, pursuant to the stipulation of the parties. Bishop Estate then executed a new lease with the Kahala Hilton Hotel Associates Limited Partnership, in accordance with the terms set forth in the Letter Agreement. A memorandum of the new lease was recorded at the Bureau of Conveyances on October 28, 1993. The conveyance tax paid reflected a land valuation, for conveyance tax purposes, of $20,000,000 (representing $1,200,000 in annual rent capitalized at the statutory rate of six percent).

The City thereafter rendered its assessment of the land and buildings situated on the property known as the Kahala Hilton Hotel, Tax Map Key No. 3–5–023–039. The following chart illustrates the land and building valuations assigned by the City and Weinberg for the tax years 1991 and 1992:

1991 Tax Year
(7/1/91 - 6/30/92)
Valuation date: January 1, 1991

|  | Land | Building | TOTAL |
|---|---|---|---|
| The City | $72,303,000 | $37,576,000 | $109,879,000 |
| Weinberg | $20,000,000 | no dispute | $ 57,576,000 |

1992 Tax Year
(7/1/92 - 6/30/93)
Valuation date: January 1, 1992

|  | Land | Building | TOTAL |
|---|---|---|---|
| The City | $72,303,000 | $38,800,100 | $111,103,100 |
| Weinberg | $20,000,000 | no dispute | $ 58,000,100 |

Relying on Revised Ordinances of Honolulu (ROH) §§ 8–12.3(1), (2), and (4) (1990), Weinberg challenged the City's land value assessment of the property before the tax appeal court. ROH § 8–12.3 provides that an assessment may be lowered if:

(1) *assessment of the property exceeds by more than 10 percent the market value of the property,* or (2) *lack of uniformity or inequality, brought about by illegality of the methods used or error in the application of the methods to the property involved,* or (3) denial of an exemption to which the taxpayer is entitled and for which such person has qualified, or (4) *illegality, on any ground arising under the Constitution or laws of the United States or the laws of the state or the ordinances of the city in addition to the ground of illegality of the methods used, mentioned in clause (2).*

ROH § 8–12.3 (emphases added).

At the hearings before the tax appeal court, arbitrators Ordway and Hulten described how they had arrived at their arbitration decision and acknowledged that the final award was the result of a compromise decision. In Hulten's view, the evidence presented by the lessee was more credible than the

evidence offered by the lessor because the lessee's approaches to valuation recognized the express terms of the lease by taking "into consideration the use to which the land [was] then put by the Lessee[.]" For example, the lessee utilized some market land comparables from vacant neighbor island properties, as well as the income approach[1] to valuation, based on the existing use of the property.

Hulten testified that, in contrast, the Bishop Estate's evidence "was on the basis of highest and best use if vacant," which was contrary to the terms of the lease. According to Hulten, Bishop Estate "projected the development of about 70 ultra luxury condominium units on the property to sell for six or seven million dollars a piece and there was no presentation of any marketability."

Arbitrator Ordway testified that, "[w]ithin the four corners of the lease, taking into consideration the restrictions in the lease document, I valued the land at $93,350,000." He recalled that three appraisal reports were presented to the panel and that, "[i]n reviewing the data and the quality of the data, I put most emphasis on the market approach and the least emphasis on various residual approaches that had been used as a sub-set of the cost approach. And I put some weight on the income approach."

Robert C. Hastings, Jr., one of the appraisers who had made a presentation before the arbitrators, used a number of valuation methods to determine the value of the land. Regarding his land valuations for the tax years 1991 and 1992, Hastings testified that

[m]arket comparison with resort sites gave us a value of $20,300,000 in 1991 and $18,-450,000 in 1992. The present value to have the lease rent paid to the Bishop Estate through Tokyo General is $24,345,000 for 1991 and 1992. The land residual technique ... was [$]20,085,000 for 1991 and 1992.... The ground rent capitalization method ... gives us $17,100,000 and $21,-390,000, based on 1991 economics, and then finally using projected numbers for an optimized an[d] renovated property, we've got a value of $19,220,000 to $24,020,000 depending upon the interest rate that is used and the capitalization rate that is employed and that is for both years 1991 and 1992.

In Hastings's opinion, the value of the land was $20,930,000 as of 1991 and $19,300,000 as of 1992.

Michael K. Okamoto, supervisor and real property appraiser for the City and County of Honolulu, testified regarding the 1991 and 1992 assessments of the Kahala Hilton property. Although Okamoto did not personally perform the appraisal of the Kahala Hilton, he testified that he had "set the benchmarks" and "did sit down with [the staff] appraiser and [go] over her sales [figures of other properties]." Although Okamoto conceded that he had difficulty finding other sales, he nevertheless testified that he had not used the income approach and that he disagreed with the use of the income approach to valuation "based on our ordinance at the present time." Because there were no other resort hotels located in the same tax zone as the Kahala Hilton, the four hotels used by the City as comparisons were all located in Waikīkī—the Hilton Hawaiian Village Hotel, the Pacific Beach Hotel, the Outrigger Reef Hotel, and the Halekulani Hotel.

In addition to the Waikīkī "comparables," the tax appeal court admitted the confirmed arbitration award as evidence of the property's value, although it denied the City's request to treat the arbitration award as dispositive on the issue of market value of the land. The tax appeal court also allowed the admission of, but did not accord any weight to, the terms contained in the new lease agreement between Bishop Estate and the new owner of the Kahala Hilton.

Additionally, the tax appeal court ruled that the City's appraiser did not err in *not* using the income approach in assessing the property and in not following the valuation

---

1.  "With the income approach to value, the assessor converts income into an estimate of value. The income approach is premised on the assumption that people buy property for the income it will yield to them in the future. This premise is true of most commercial property." *Procedure and Reference Manual of the Real Property Assessment Division, Department of Finance, City and County of Honolulu* [hereinafter, *Procedure and Reference Manual*] § 1050.00.

guidelines in the *Procedure and Reference Manual,* which recommended utilizing the income approach for commercial real estate valuation. On October 27, 1994, the tax appeal court upheld the City's assessed land values in its "Findings of Fact [(FOF)], Conclusions of Law [(COL)], and Judgment," and this timely appeal followed.

## II. *STANDARDS OF REVIEW*

■ It is well settled that[,] in reviewing the decision and findings of the Tax Appeal Court, a presumption arises favoring its actions which should not be overturned without good and sufficient reason. The appellant has the burden of showing that the decision of the Tax Appeal Court was "clearly erroneous."

*City and County of Honolulu v. Steiner,* 73 Haw. 449, 453, 834 P.2d 1302, 1306 (1992) (citations omitted). In a tax appeal context, findings supported by substantial evidence are not clearly erroneous unless an appellate court is left with "a definite and firm conviction that a mistake has been made." *In re Tax Appeal of Frank W. Swann,* 7 Haw.App. 390, 399, 776 P.2d 395, 401 (1989) (citations omitted). Questions of law, however, are reviewed under the right/wrong standard. *In re Tax Appeal of Fuji Photo Film Hawaii, Inc.,* 79 Hawai'i 503, 508, 904 P.2d 517, 522 (1995).

## III. *DISCUSSION*

On appeal, Weinberg essentially contends that the tax appeal court erred in: (1) finding no error in the City's failure to use the income approach to value the Kahala Hilton Hotel property; (2) interpreting ROH § 8–7.1(a) to preclude the use of the income approach to appraise real property; (3) finding no error in the City's failure to follow the valuation guidelines in the *Procedure and Reference Manual;* (4) admitting and giving limited weight to the arbitration award as evidence of land value; and (5) giving no weight to the new lease terms that took

**2.** The "market data approach"
involves obtaining all available sales data, qualifying these as being transacted at "arms-length" conditions or being "bona fide" transactions, and comparing these recently sold

effect after the 1991 and 1992 tax years. We discuss each contention in turn.

### A. *The Income Approach*

#### 1.

■ The income approach, *see supra* note 1, is useful in "appraising highly valued commercial properties that are rarely sold[.]" *Procedure and Reference Manual* § 912.00. Noting that the Kahala Hilton is a "highly valued commercial propert[y] that [is] rarely sold," Weinberg challenges the tax appeal court's finding that the "City did not err in not using the income approach to value the Kahala Hilton Hotel property[ ] [and that] [t]he income approach is not permitted by Section 8–7.1(a), ROH." FOF 59.

■ "When interpreting a municipal ordinance, we apply the same rules of construction that we apply to statutes." *Bishop Square Assoc. v. City and County of Honolulu,* 76 Hawai'i 232, 234, 873 P.2d 770, 772 (1994) (quoting *Waikiki Resort Hotel v. City and County of Honolulu,* 63 Haw. 222, 239, 624 P.2d 1353, 1365 (1981)). The interpretation of a statute is a question of law reviewable *de novo. In re Fuji Film,* 79 Hawai'i at 508, 904 P.2d at 522. The purpose of the ordinance may be obtained primarily from the language of the ordinance itself; however, in order to construe the ordinance in a manner consistent with its purpose, the language must be read in the context of the entire ordinance. *Cf. Bumanglag v. Oahu Sugar Co., Ltd.* 78 Hawai'i 275, 280, 892 P.2d 468, 473 (1995) (citations omitted).

ROH § 8–7.1(a) is clear and unambiguous regarding the approaches to valuation that the City must follow to accomplish its mission of assessing real property on a "mass valuation" basis. The ordinance provides in pertinent part that:

The director of finance shall cause the fair market value of all taxable real property to be determined and annually assessed by the market data[2] and cost approaches to

properties to the one being appraised, making adjustments as necessary for comparisons. Unit prices demonstrated by actual sales, either adjusted or unadjusted, provide valid estimates of market value. Adjustments for dis-

value using appropriate systematic methods suitable for mass valuation of properties for taxation purposes, so selected and applied to obtain, as far as possible, uniform and equalized assessments throughout the county[.]

In its rulings, the tax appeal court agreed with the City's argument that ROH § 8–7.1(a) mandates that only the market data and cost approaches to value be utilized and that the ordinance does not permit the use of the income approach.

Relying on this court's opinion in *In re AMFAC, Inc.*, 65 Haw. 499, 654 P.2d 363 (1982), Weinberg argues that the language of ROH § 8–7.1(a) should be read as directory rather than mandatory. In *AMFAC*, we interpreted an appraisal statute, HRS § 246–10(g) (1976), which provided in pertinent part that "[b]uildings shall be valued each year upon the basis of the cost of replacement less depreciation, if any. Age, condition[,] and utility or obsolescence shall be considered." *Id.* We disagreed with the director's contention that HRS § 246–10(g) mandated the exclusive application of the replacement cost method of valuing buildings such that the director would be entirely without discretion to consider or utilize alternative modes of valuation. *AMFAC*, 65 Haw. at 502, 654 P.2d at 365.

Weinberg's reliance on Amfac is misplaced for two reasons. First, our conclusion in *AMFAC* that the language of the statute was directory rather than mandatory was principally based on the existence of the additional factors enumerated in HRS § 246–10(g). The *AMFAC* court reasoned that the statute's requirement that "age, condition[,] and utility or obsolescence shall be considered ... [indicated that] the legislature intended that the director be permitted to consider and potentially utilize *any means* which most appropriately reflect[ed] consideration of these factors." *Id.* at 503, 654 P.2d at 366 (emphasis added). There are no such addi-

tional factors enumerated in ROH § 8–7.1(a), and *AMFAC* is inapposite.

Moreover, HRS § 246–10(g) is no longer controlling. Effective July 1, 1981, the powers, functions, and duties exercised by the director with respect to taxation of real property were turned over to the respective counties. *See* 1980 Haw. Sess. L. Act 279, at 533 (codified in HRS Chapter 246A (1985)). Therefore, as the ICA noted in a subsequent case, "*AMFAC* is not a case in point. *AMFAC* involved the statutory construction of HRS § 246–10(g), which applied to the State Director of Taxation before real property functions were transferred to the counties." *In re Swann*, 7 Haw.App. at 398, 776 P.2d at 400–01 (interpreting Maui ordinance identical to ROH § 8–7.1(a) and holding that valuation of Appellants' real property—land using market data approach and building using replacement cost—satisfied ordinance requiring use of "market data and cost approaches to value[;]" and recognizing that market data approach is not suitable for mass valuations of buildings on improved land).

■ Weinberg contends, however, that the transfer to the counties of "all functions, powers, and duties relating to the taxation of real property heretofore reserved to the State," HRS § 246A–1, includes the duty to consider "selling prices and income ..., and all other influences, whether similar to those listed or not, which fairly and reasonably bear upon the question of value." HRS § 246–10(f)(1). His argument is based on his interpretation of HRS § 246A–2(3) (1993), which provides in relevant part that:

[e]ach of the counties, ... shall succeed to all of the rights and powers previously exercised, and all of the duties and obligations incurred by the department of taxation in the exercise of the functions, powers, duties and authority transferred, whether such functions, powers, duties, and authority are mentioned in or granted by any law, contract, or other document.

similarities in the market data approach to value are made by plus or minus of dollar amount or percentages, from the comparable parcels to the subject, benchmark or typical parcel in the neighborhood. The major factors which should be considered in the adjustments include the time of sale, terms of the sale,

location of compared parcels, differences in physical characteristics among them, and all other factors which might have been significant so as to influence the prices paid for the properties.
*Procedure and Reference Manual, supra,* § 911.00.

Weinberg's argument is untenable. The purpose of HRS Chapter 246A was "to provide for the orderly transfer of [real property taxation] functions, powers, and duties, ... to the counties." HRS § 246A–1. HRS §§ 246A–2(1) and 246A–2(2) generally describe an eleven-year transition period during which the counties, by majority agreement among themselves, were to adopt ordinances to "provide for uniform policies and methods of assessment for the taxation of all real property throughout the state." Each county was also to "enact by ordinance and adopt as law for the county all of the real property tax exemptions ... as now provided by law." By their own terms, HRS §§ 246A–2(1) and 246A–2(2) lapsed after a period of eleven years, in November 1989. Adoption of Weinberg's interpretation of HRS § 246A–2(3)—that the counties are still bound by the same assessment methods that were imposed on the State Department of Taxation—would render the provision of an eleven-year transition period meaningless because HRS chapter 246, rather than county ordinances, would continue to govern the policies and methods of assessment. We hold, therefore, that, to the extent that there is any conflict between HRS § 246–10(f)(1) and ROH § 8–7.1(a), it is the ordinance, and not the statute, that is controlling.

■ Although the language of the ordinance unambiguously mandates use of the market data and cost approaches, we also note that the income approach is not a "suitable method for mass valuations of properties for tax purposes" under ROH § 8–7.1(a). Generally, the data concerning income generated by a property is not readily available to the tax assessor. Furthermore, we agree with the City that the income approach does not promote "uniform and equalized assessments" because it gives an advantage, with respect to real property taxes, to an inefficiently operated and poorly maintained property. Because ROH § 8–7.1(a) plainly requires that the director of finance assess the fair market value of taxable real property

using "the market data and cost approaches" and, because this is consistent with the underlying purpose of the ordinance, we further hold that the tax appeal court did not err when it concluded that "[t]he income approach is not permitted by Section 8–7.1(a), ROH." In other words, ROH § 8–7.1(a) precludes the director of finance from utilizing the income approach in assessing the fair market value of taxable real property.

We recognize, however, that use of the market data and cost approaches will not always yield a fair market value with respect to each particular parcel of property. The accuracy of an assessment by the market data approach depends on the existence of appropriate comparable properties.[3] The law recognizes that property valuation is not an exact science; therefore, an individual assessment must exceed fair market value by more than ten per cent in order to be corrected. ROH § 8–12.3(1).

■ The law provides a mechanism under which a taxpayer, who believes that his or her property has been overvalued, can appeal. *See* HRS §§ 232–8 through 232–14; HRS §§ 232–14 through 232–18; ROH §§ 8–12.1 through 12.12. Our holding—that the City is precluded from using the income approach by ROH § 8–7.1(a)—does not mean that the taxpayer, in attempting to convince the court that the City's assessment is erroneous, may not introduce otherwise relevant and admissible evidence of the valuation obtained using the income approach or any other recognized appraisal method. The weight of that evidence and whether the use of the income approach or some other method, in a given case, would help in the determination of fair market value are matters within the sound discretion of the tax appeal court.

■ In this case, Weinberg's expert, Hastings, testified that he used various income approaches, as well as the market data approach, in arriving at his assessment. There was also considerable testimony regarding the absence of "comparables," which

3. "The less adjustments needed among the comparable properties result in the assurance that properties are indeed comparable and the value

indication by the market data approach is reliable." *Procedure and Reference Manual* § 911.

was relevant to the tax appeal court's consideration of whether the income approach would more appropriately ensure uniform and equalized assessments. Despite the tax appeal court's finding that the City was precluded from using the income approach, the court's FOF reflect that the tax appeal court properly considered this evidence. Its finding that "the market data approach is the preferred method in this case, rather than the various income approaches," FOF 56, was not clearly erroneous, and we are without "good and sufficient reason" to overturn it. *See Steiner*, 73 Haw. at 453, 834 P.2d at 1306.

### 2.

■ Another issue related to the interpretation of ROH § 8–7.1(a) is Weinberg's contention that the market data approach could be misleading because of real estate sales to Japanese investors during the "bubble economy" in 1990. The record is replete with testimony regarding the low interest rates charged by Japanese banks, the yen-dollar exchange rate, the influx of Japanese investment in Hawai'i from 1986 to 1990, and the "radical paradigm shift" in the local real estate market.

A similar contention was raised and thoroughly considered in *Steiner*, where we rejected the "argument that sales to Japanese buyers do not reflect the fair market value of the properties sold to them." 73 Haw. at 462–65, 834 P.2d at 1310–11. We adhere to our holding in *Steiner* and will not ignore sales of properties to foreign investors.

### B. *The Procedure and Reference Manual Guidelines*

Weinberg also contends that the tax appeal court erred in finding that the City's failure to follow the valuation guidelines in the *Procedure and Reference Manual*, which provided for the use of the income approach, was not error. Based on our foregoing discussion in section II.A., wherein we held that ROH § 8–7.1(a) precludes the City from using the income approach, we discern no error in the tax appeal court's finding.

### C. *The Arbitration Award*

■ Prior to the tax appeal hearing, the tax appeal court denied the City's request to take judicial notice of the arbitration award as determinative of the property's value, but allowed the introduction of the arbitration award as evidence of the land's market value. Relying on *Honolulu Redevelopment Agency v. Pun Gun*, 49 Haw. 640, 426 P.2d 324 (1967), an eminent domain proceeding, Weinberg contends that the value of the land as established in the arbitration award is inadmissible. In *Pun Gun*, we held that evidence of other sales to a condemnor

> should not be automatically excluded as a matter of law. If it can be shown to the satisfaction of the trial court that the price paid was sufficiently voluntary to be a reasonable index of value, or that there is a necessity for the evidence because the only sales of comparable property in the area in recent years have been to the condemnor, such evidence should be admitted.

*Pun Gun*, 49 Haw. at 642, 426 P.2d at 325 (citations and footnote omitted). Weinberg contends that the arbitration award should not have been admitted because it was a product of a compromised decision by the three arbitrators, and not the result of an "arm's length" transaction, entered into voluntarily.

The City, in its answering brief, does not dispute "the general rule that evidence of sales which are compulsorily determined or the subject of compromises, including many arbitration awards, awards in condemnation actions, sales under threat of condemnation, and lease rent renegotiations under the threat of lease rent arbitration, are inadmissible." However, of the two exceptions to the general rule of inadmissibility recognized in *Pun Gun*, the City relies on the second exception, relating to necessity, and argues that the showing of necessity was established through the affidavit of Okamoto, the City's supervising appraiser, who stated:

> That with respect to the Kahala Hilton Hotel, there is a significant lack of sales comparables or other sources of data upon which to determine market value and in such a case, analysis of ground lease negotiations/arbitration awards is an acceptable

appraisal technique utilized to determine the market value of land.

Okamoto's testimony regarding the lack of comparable properties is supported by the City's significant adjustments made to the four "comparable" Waikīkī properties. *See* III.A.1., *supra.*

In *Pun Gun,* we held that, once necessity was established, evidence of a compromised valuation (*i.e.,* prior sales to the condemnor) is admissible as evidence in support of an expert's valuation opinion. However, we did not decide whether such a compromised valuation would be admissible as direct evidence of value. *See Pun Gun,* 49 Haw. at 647, 426 P.2d at 328 ("We hold that evidence of other sales to a condemnor used in support of an expert witness' opinion is admissible in the discretion of the trial court. The admissibility of such evidence if offered as direct evidence of value is not before us."); *accord City and County of Honolulu v. International Air Serv. Co., Ltd.,* 63 Haw. 322, 328 n. 5, 628 P.2d 192, 198 n. 5 (1981) (the admissibility of other sales to a condemnor offered as direct evidence of value is not reached).

In the present case, the tax appeal court explicitly denied the City's request that it take judicial notice of the arbitration award as being dispositive of the value of the land. FOF 11. Evidence of the $93,350,000 compromised valuation was supported by lengthy testimony from arbitrators Hulten and Ordway regarding the processes they used in arriving at their individual determinations and the final compromised valuation. It was clearly within the tax appeal court's discretion to examine and weigh the testimony of the arbitrators against that of other expert witnesses to determine whether the $93,350,-000 figure should be considered in its determination of valuation.

The tax appeal court, for example, gave substantial weight to the City's 1991 and 1992 tax year valuations of $72,303,000 based on Ordway's value conclusions of $88,350,000 to $89,350,000 for the 1991 tax year and $58,350,000 to $65,350,000 for the 1992 tax year. FOF 57. Ordway testified as follows:

Q. Your opinion [as to the value of the land] was 93.35 million as of November 1st, 1990?

A. That is correct.

Q. Would that value hold true as of January 1, 1991?

A. No.

Q. Would there be a reduction?

A. You would have a reduction each month of about two to two-and-a-half million dollars[.]

Weinberg maintains that, "these offhand statements" were "mathematical extrapolations" that do not rise to the dignity of "valuation conclusions[.]" We disagree. In light of Ordway's credentials, including: (1) "a degree for law in real estate and political science"; (2) an MBA in real estate; and (3) a Ph.D. in land economics, as well as having authored major books and articles in appraisal journals relating to income property appraisal, and considering Ordway's entire testimony, we hold that the tax appeal court did not err in considering Ordway's reduction figures to support the City's 1991 and 1992 valuations.

Based on the record and the fact that: (1) the valuation processes used by the arbitrators were presented at trial; (2) the arbitration award was not dispositive as direct evidence of value; and (3) necessity for the compromised valuation was demonstrated by the lack of adequate comparables, we hold that the tax appeal court did not err in admitting the arbitration award as evidence of value.

### D. *The New Lease Agreement*

Weinberg's final contention is that the tax appeal court erred by not giving weight to the new lease agreement between Bishop Estate and Kahala Hotel Associates Limited Partnership. The tax appeal court stated:

The [c]ourt is unable to give any weight to the new Lease which took effect after the 1991 and 1992 Tax Years.... In negotiating the new Lease, [Bishop Estate] did not concede that a $5,601,000 annual lease rent was unsupported. Moreover, projections of revenues from the new Lease are highly speculative and depend [sic] of [sic? or on?] the strategies of parties who were not before this Court.

FOF 56. However, Weinberg contends that relevant market data should not be ignored simply because it occurred after the applicable valuation or assessment date. We have examined this issue in an eminent domain/condemnation context and stated:

> Where evidence of a comparable sale or lease is offered, the trial judge may, in his [or her] discretion, admit or exclude it considering such factors as time of the transaction, size, shape and character of the comparable land, and whether there has been any enhancement or depression in value. *It makes no difference whether the transaction occurred before or after the date of condemnation so long as it is not too remote a period of time and the land is reasonably comparable, having been neither enhanced or decreased in value by the project or improvement occasioning the taking.* The weight to be given such evidence is for the jury [or trier of fact]. The trial judge's determination as to admissibility or non-admissibility of such evidence will not be upset on appeal unless it is a clear abuse of discretion.

*State v. Heirs of Halemano Kapahi*, 48 Haw. 101, 112–13, 48 Haw. 147, 395 P.2d 932, 939 (1964) (emphasis added and citations omitted). Under the traditional abuse of discretion standard of review, the tax appeal court's decision may not be reversed on appeal unless it "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Sato v. Tawata,* 79 Hawai'i 14, 19, 897 P.2d 941, 949 (1995) (citation omitted).

The City, however, argues that the tax appeal court's finding was not based on the fact that the lease took effect after the tax years in question, but because "projections of revenues from the new lease are highly speculative and depend [sic] of [sic?] the strategies of parties who were not before this Court." FOF 56. In the context of the tax appeal court's other findings, we are puzzled by the court's ruling because the evidence underlying the arbitration award clearly involved the opinions of three appraisers, albeit followed by an analysis of the projections by the three arbitrators. Further, the use of market comparables necessarily involves the strategies of parties not before the court. As we stated in *Pun Gun,*

> To say that the trial court would be searching into the motives of the parties to decide whether there was compulsion, coercion, or compromise does not solve the problem facing the [fact-finder who] is trying to determine elusive fair market value. A rule of non-admissibility may lead to a dearth of information resulting in vacuous speculation by the jury [or trier of fact].

*Pun Gun,* 49 Haw. at 643 n. 4, 426 P.2d at 326 n. 4. Although the new lease terms were admitted into evidence, we believe that the tax appeal court's failure to give any weight to the new lease prevented its consideration of potentially probative evidence of the property's fair market value because it was the only recent open market transaction involving the property at issue. *See, e.g., City and County of Honolulu v. Bishop Trust Co.,* 48 Haw. 444, 459, 404 P.2d 373, 383 (1965) (noting, in an eminent domain proceeding, that the nature of the error was clear and, thus, no offer of proof was necessary where "[t]he City's expert witness was limited in his explanation of his use of the comparative method. He was permitted to paint in the background, but was precluded from putting in the picture.").

■ Nevertheless, because the weight given to evidence is within the province of the tax appeal court, which will not generally be disturbed on appeal, *cf. Carlos v. MTL, Inc.,* 77 Hawai'i 269, 276, 883 P.2d 691, 698 (App.1994), we are constrained to conclude that the tax appeal court did not abuse its discretion by assigning no weight to the new lease agreement.

## IV. *CONCLUSION*

Based on the foregoing, we hold that the tax appeal court: (1) did not err in finding that the City's failure to use the income approach to value the Kahala Hilton Hotel property was not error; (2) did not err in interpreting ROH § 8–7.1(a) to preclude the

City's use of the income approach to appraise real property; (3) did not err in admitting and giving limited weight to the arbitration award; and (4) did not abuse its discretion in not giving weight to the new lease agreement. Accordingly, we affirm the judgment of the tax appeal court.