486 P.2d 281

The TITLE & TRUST COMPANY (IDAHO TITLE CO), E. 47' of Lot 10, and W. 8½' of N. 47' 8" of Lot 11, Blk. 43, B.C.O.T., et al., Plaintiffs-Appellants,

v.

BOARD OF EQUALIZATION, ADA COUNTY, State of Idaho, Defendant-Respondent.

OPPENHEIMER–FALK REALTY CO. et al., Plaintiffs-Appellants,

v.

BOARD OF EQUALIZATION, ADA COUNTY, State of Idaho, Defendant-Respondent.

No. 10517.

Supreme Court of Idaho.

June 23, 1971.

Hawley, Troxell, Ennis & Hawley and Eberle, Berlin, Morgan, Kading & Turnbow, Boise, for appellants.

Ellison Matthews, Pros. Atty., Ada County, Boise, for respondent.

SPEAR, Justice.

The appellants in this case are taxpayers protesting the amount of ad valorem taxes assessed against their real property in 1967. They challenge the method by which the Ada County Assessor established the value of real estate in Ada County for tax purposes, contending that it has resulted in their being taxed at a rate discriminatorily higher than other real estate owners in the county. Appellants concede at the outset that the assessor correctly set the full cash value of their properties and that they were taxed at the proper rate. They maintain, however, that the method by which the cash value of much of the other real estate in the county was determined was erroneous and inaccurate with the result that most of the other property was valued at figures below its true cash value. While such other property was taxed at the same percentage of the appraised value as appellants', because of the disparity among appraised values as established by the assessor, appellants allege that they actually paid ad valorem tax based on a higher percentage of true cash value than did other taxpayers throughout Ada County generally.

Appellants protested the assessed value of their property for ad valorem tax purposes to the Board of Equalization of Ada County. The board denied a reduction in assessed value and the State Tax Commission and district court affirmed the denial. In the district court evidence was taken regarding the methods (in addition to inspection and evaluation of some individual properties) used by the assessor to establish the full cash value of parcels of real estate for tax purposes. Appellants attack each of these as inaccurate and resulting in discrimination toward them.

Most residential property was appraised by correcting the 1965 assessment to more nearly reflect the true value of the individual parcels. The 1965 assessment on these properties was established by the use of a "Manual of Appraisals" copyright in 1945 by Mr. Roy Leonardson, then the Ada County Assessor. This manual purported to establish cash value from the cost of construction during the period 1938–41. These costs were multiplied by two, to update the figures, and decreased to allow for depreciation. Taking these 1965 values, the assessor attempted to arrive at a true full cash value for 1967 by multiplying each by a multiplier calculated to accomplish this purpose.

The multipliers were developed by two deputy assessors, Mr. Crowe and Mr. Davis. Instances of recent sales and other data were examined for from three to forty parcels in each of approximately 300 of the 850 subdivisions in Ada County. Each man employed similar procedures. They looked for recent sales that they felt were arms length transactions of vacant lots and improved parcels in each subdivision, and, if a satisfactory number was not found, they solicited opinions as to value from realtors. Having found samples of what was felt to be transactions which approached true cash value, an aggregate of full cash value for land and separately for improvements was established for all the parcels examined in each subdivision. An aggregate of the 1965 assessed values of these parcels was then computed. The men then calculated a multiplier for the subdivisions examined by finding the reciprocal of the ratio of the aggregate of assessed value to the aggregate of the respective full cash values. Crowe applied the multipliers that he calculated for each of 60 subdivisions to the individual parcels in each subdivision and thus arrived at a full cash value for all such parcels. Davis found the average multiplier for the remaining 240 subdivisions examined and applied this multiplier to the remaining 790 subdivisions in Ada County. The average multipliers thus employed by Davis were found to be 8.0 for land and 7.5 for improvements.

For the year 1967, the assessor determined the full cash value of choice residential view lots by physical inspection of the individual sites.

In the original townsite of Boise City, the assessor valued residential lots at $50.00 per front foot. He determined full cash value of improvements on these lots by correcting the 1965 assessment with multipliers as above described.

The assessor fixed the value of tracts of agricultural land by various methods, depending on the size of the tract. If the plot was from one to five acres, the assessor appraised the land by increasing the 1965 assessment by a factor of 8, the county-wide multiplier for land which Davis had developed. For parcels from five to ten acres the assessor determined the assessed value by increasing the 1965 assessment by 10 percent. In 1966, non-irrigated land outside the urban area had been assessed at $2.00 per acre and irrigated land at from $57.00 to $71.00 per acre. The assessor increased the 1966 assessed value of both types of land by 5 percent for 1967. The assessed value for improvements on all types of agricultural land was determined by increasing the 1965 assessment, which was also based on the 1938–41 cost of construction previously discussed, by 5 percent.

The assessor fixed the value of commercial property in the county by several methods. Some 100 parcels had been reappraised for 1967 by physical inspection using a manual and sheets prepared by the Idaho State Tax Commission. Other parcels of commercial property, including some involved in this appeal, had had full cash value determined on appeals to the State Tax Commission and the district court, and the assessor used the values as thus determined in 1967. Remaining parcels of commercial property were assessed at the 1965 amount, which was based on the 1938–41 cost of reconstruction, except for some parcels which were reduced in

valuation where the assessor thought the 1965 figure was too high.

To these purported full cash values found by the assessor, the assessor applied an assessment rate of 15 percent.

Evidence presented by appellants was from two sources: a study of real property sales in Ada County conducted by the Idaho State Tax Commission and studies made by Mr. Johnston and Mr. Harper. The study conducted by the commission compared recent sales of property in all three categories to assessed valuation. In all, the commission surveyed 440 residential, 26 rural, and 14 commercial sales. The average assessment rate computed on the basis of the ratio between assessed values and sale prices was 12.7 percent for residential, 10.3 percent for rural, and 13.4 percent for commercial and the weighted ratio considering all types of property was 12.5 percent. Johnston's study of fifteen (15) sales of property showed an assessment rate of 6.6 percent. Harper testified that in sales of agricultural land with which he was familiar, non-irrigated land was selling at from $45 to $110 per acre and irrigated land was selling at from $794 to $1210 per acre. These studies submitted by appellants represented less than 1½ percent of the total number of parcels in the county and approximately 1.73 percent of the total assessed valuation of the three classes of property.

The district court made thorough findings of fact, 29 in number, of which the following are the most pertinent.

"XIV.

"The assessor determined in 1967 that all real property in Ada County should be uniformly assessed at 15 percent of full cash value. To this end the assessor computed the assessed value for 1967 of each parcel of property for which a full cash value had been determined, by the methods heretofore described, by multiplying said full cash value by 0.15. For those parcels which were assessed in 1967 by increasing a prior year's assessed value by a flat per-

centage, as heretofore described, the increase in assessed value was that which in the assessor's opinion was necessary to bring such assessed value to 15 percent of full cash value. Thus the nominal assessment rate applied to all real property in Ada County in 1967 was 15 percent.

"XV.

"The use by the assessor of multipliers, particularly to the extent they were used on a county-wide basis, and uniform front foot value rates to fix full cash values of individual residential parcels and small agricultural parcels, and the method of increasing the prior year's assessed values of larger agricultural parcels and rural improvements by a flat percentage were arbitrary methods not reasonably calculated to fix the actual full cash value of the individual parcels or the assessment rate at 15 percent of the actual full cash value of the individual parcels, because these methods failed to account for individual variations among individual parcels, e. g., in physical condition, physical features, location, and conditions and use of surrounding properties and neighborhoods.

"XVI. [misnumbered as XIV]

"The Assessor's Manual did not take into consideration economic and functional obsolescence, and would require multipliers of 3.79 to 4.11 to correct 1938–41 costs to 1967 costs. Therefore, as to those commercial parcels which were assessed on the basis of this Manual, the assessments were arbitrary and not reasonably calculated to fix the assessed value at 15 percent of actual full cash value of the individual parcels involved. However, it is not clear from the evidence whether the net results of these defects in the Manual was to overvalue or undervalue the parcels because the failure to consider obsolescence would tend to overvaluation but low construction costs would tend to undervaluation."

"XVIII.

"There were in 1967 in excess of 38,000 parcels of real property in Ada County, of

which detail cards on improvements existed for approximately 27,000. For the assessor to make a new physical appraisal of each of said parcels in 1967 within the time allowed for preparation of the assessment roll, to-wit, between the second Monday of January and the fourth Monday of June, would have been impossible because of lack of staff and funds. The assessor used the arbitrary methods heretofore described in assessing a portion of the parcels of real property in 1967 in a good faith attempt to assess all real property in the county at a uniform rate of 15 percent of actual full cash value and such methods were not designed to deliberately and purposefully undervalue said parcels of real property."

"XXIII

"The 480 samples used in the Tax Commission study and the 15 samples used in Rod Johnson's study combined represented less than 1½ percent of the total number of parcels in Ada County and approximately 1.73 percent of the total assessed value of the three classes of property in the county. The record does not disclose as to the 15 samples studied by Rod Johnston how many were from each of the classes residential, rural and commercial. The record reveals as to the Tax Commission study that the 440 residential samples constituted 1.9 percent of the total assessed value in the county of property in that class, the 26 rural samples constituted 0.78 percent of the total assessed value in the county of property in that class, and that the 14 commercial samples constituted 1.4 percent of the total assessed value in the county of property in that class. The record does not reveal what percentage of the total number of parcels of each class in the county such samples represented.

"In view of the variable factors that influence market or full cash value such as physical condition, physical features, location, and conditions and use of surrounding properties and neighborhoods, there is no evidence to show that said samples were typical and representative of other property of the same class throughout the county.

"XXIV.

"As to the 480 samples used in the Tax Commission study, the sales date was taken almost entirely from revenue stamps and consideration recited in deeds. Without verification such data is not a reliable indication of actual sales prices. There is evidence that from 100- to 150 samples were verified, but the record does not disclose whether samples in all three classes were verified and if so how many samples in each class were verified, nor what the verification revealed as to how accurately the revenue stamps and recited consideration reflected actual sales prices. The evidence, therefore, failed to show that the sales prices used in the Tax Commission study represented the actual full cash values of the samples.

"As to the 15 samples considered by Rod Johnston, the record indicates the witness was familiar with the actual sales prices at which the parcels were sold.

"XXV.

"The Tax Commission study and the Rod Johnston samples showed that there were extreme variations in the assessment rate as to individual samples both above and below the nominal assessment rate of 15 percent. In the Tax Commission study such extreme variations appeared in all three classes of property involved. Rod Johnston's samples were not broken down into classes.

"The evidence did not disclose as to either study what the median ratio or assessment rate was or the frequency in which the various ratios or rates appeared among the samples.

"The evidence failed to prove that there was a fixed or definite pattern of undervaluation or that there was any designed, deliberate and purposeful undervaluation in view of the variations in the samples both above and below the nominal assessment rate.

"In view of the variations in assessment rates among the individual samples both above and below the nominal assessment

rate, the county-wide weighted assessment rate of 12.5 percent calculated by the Tax Commission in its study is not a significant variation from the nominal assessment rate of 15 percent.

"The 6.6 percent assessment rate calculated by Rod Johnston on the basis of the ratio of the aggregate assessed value to the aggregate sales price of the 15 samples studied by him is a significant variation from the nominal assessment rate of 15 percent, but the number of samples relied on by Rod Johnston in calculating such assessment rate did not constitute a reasonable number of samples in view of the total number of parcels of real property in Ada County and the total assessed value of such real property.

"XXVI.

"The evidence established that trained appraisers may vary 5- to 10 percent in fixing the full cash or market value of real property.

"XXVII.

"The evidence fails to establish that the actual rate of assessment applied by the Ada County assessor in fixing the assessed value of real property in Ada County in 1967 was other than 15 percent, which is the rate which said assessor purported to apply uniformly to all said property.

"XXVIII.

"The evidence fails to establish that real property in Ada County was generally undervalued by the Ada County assessor for assessment purposes in 1967 or that any undervaluation that occurred was intentional and systematic.

"XXIX.

"The taxpayers failed to establish a prima facie case of prejudicial discrimination relative to the assessed values placed upon their respective parcels of real property by the Ada County assessor in 1967."

On the basis of his findings of fact, the trial judge entered appropriate conclusions of law, nearly all of which have been designated by appellants as their assignments of error in this appeal. The district court then denied appellants any reduction in their 1967 ad valorem taxes. Appellants submit assignments of error based on several of the district court's conclusions including: that the evidence failed to prove a definite pattern of designed or deliberate undervaluation, that appellants failed to establish a prima facie case of prejudicial discrimination against them, that the evidence of the arbitrary and erroneous methods of assessment was insufficient to rebut the presumption of fairness, that the evidence failed to establish that the actual rate of assessment was other than 15 percent and that other property was generally undervalued, that appellants' evidence did not represent a reasonable number of samples, and that any variation proven by appellants was *de minimis*. Appellants also challenge the court's conclusion that they had the burden of proving that undervaluation of other property in the county has been intentional and systematic on the part of the assessor; that to prove that such undervaluation was intentional, the appellants must prove that it was deliberate, purposeful and designed on the part of the assessor; and that to prove that such undervaluation is systematic, they must prove that it shows regularity and design or that it follows a fixed and definite pattern.

Finally, appellants allege error in the district court's holding that the assessor was effectively pursuing a program of reappraisal reasonably designed to determine full cash value of individual parcels, and that failure to complete a program of reappraisal provides no grounds for taxpayers who have had the full cash value of their properties fixed under such reappraisal program to attack their assessments for the reason that other property in the county has not been reappraised within the same taxation year.

In support of their assignments of error by the district court, appellants challenge the methods of evaluating the three types of real property as not accurately or fairly

determining the fair market value of most of the real estate in Ada County. The basic criticism of the overall scheme of evaluation is that most of the real property in the county was undervalued. Relying upon the Tax Commission study and the supporting testimony of private appraisers, appellants argue that the average rate of assessment was 12.5 percent of the true market value while their property was assessed at 15 percent of true market value—a disparity of 20 percent in amount of taxes actually paid.

Appellants also specifically criticize the methods used to fix the value of property in each of the categories above discussed. They point out that the practice of relying solely on replacements or construction cost to determine the value of improvements is invalid because this method has been condemned in two previous decisions of this court. Boise Community Hotel, Inc. v. Board of Equalization, 87 Idaho 152, 391 P.2d 840 (1964); In re Farmer's Appeal, 80 Idaho 72, 325 P.2d 278 (1958). Starting with this premise, they argue that the assessor's use of multipliers to correct the 1965 assessment based on the 1938–41 cost of construction is invalid for several reasons. First, this method presumes some sort of accuracy of the 1965 assessment and a uniform correlation between the 1965 and 1967 full values without consideration of physical depreciation or appreciation in value of individual properties, changing tastes of buyers, condition of the surrounding neighborhood, and traffic patterns. They also contend that the multipliers were given too wide an application since a county-wide improvement multipliers of 7.5 was used without inspection of 570 or approximately 67% of the subdivisions in the county. The primary criticism

of the means of appraisal of commercial properties is that most of them in 1967 were left unchanged from the 1965 values which were fixed using the 1938–41 cost of reconstruction from the Leonardson manual. Appellants' objection to the use of $50 per front foot to assess residential land in the Boise City original townsite is that it is completely arbitrary in that such a procedure makes no account for relative location. Relying on the testimony regarding the few samples presented by their two witnesses, appellants argue that all types of agricultural land were far undervalued for purposes of the 1967 assessment.

The statutory pattern existing in 1967 regarding assessment and taxation of property included the following provisions. I. C. § 63–306 [1] provided that the assessor of each county must assess all real and personal property in his county between the first Monday of January and the fourth Monday of June in each year and that tax levies shall be made on the aggregate assessed valuations of said property.

I.C. § 63–101B [2] provided:

"Assessed valuation defined.—The term 'assessed value' as used in this title shall mean twenty per cent (20%) of 'full cash value' as the latter term is hereinafter defined."

I.C. § 63–111 [3] provided:

"Value defined.—By the term 'value,' 'cash value,' 'full cash value,' 'true value' or 'true cash value' is meant the value at which the property would be taken in payment of a just debt due from a solvent debtor, or the amount the property would sell for at a voluntary sale made in the ordinary course of business, taking into consideration its earning power."

1. Ch. 312, § 12 [1965] Idaho Session Laws 849. Amended Ch. 455, § 13 [1969] Idaho Session Laws 1205, 1219.

2. Ch. 343, § 2 [1967] Idaho Session Laws 984. Effective January 1, 1967, Ch. 343, § 7 [1967] Idaho Session Laws, 987. Amended, Ch. 315, § 1 [1969] Idaho Session Laws 972.

3. Ch. 270, § 2 [1967] Idaho Session Laws 742. Effective January 1, 1967, Ch. 270, § 4 [1967] Idaho Session Laws 744. Repealed and new section added, Ch. 315 § 3 [1969] Idaho Session Laws 972.

I.C. § 63–202 [4] provided:

"Rules and regulations pertaining to full cash value.—Duty of assessors.—It shall be the duty of the state tax commission to prepare and distribute to each county assessor and each board of county commissioners within the state of Idaho, rules and regulations prescribing and directing the manner in which full cash value is to be determined. Such rules and regulations shall include the following criteria for determining value to the extent that the same are applicable to the property being evaluated: (1) earning capacity using a reasonable rate of capitalization; (2) relative location; (3) desirability and functional use; (4) reproduction costs less depreciation; (5) comparison with other like properties of known or recognized value; and (6) market value in ordinary course of trade; providing that when comparable sales are used, the burden of showing that such sales are normal and comparable shall be on the party asserting proof of such sales. The state tax commission shall also prepare and distribute from time to time such amendments and changes to said rules and regulations as shall be necessary in order to carry out the intent and purposes of this act. Said rules and regulations shall be in such form as the commission shall direct, and shall be made available upon request to other public officers and the general public in reasonable quantities without charge. In ascertaining the full cash value of any item of property subject to taxation, the assessor of each county shall be, and hereby is required to abide by, adhere to and conform with the rules and regulations hereinabove required to be promulgated by the state tax commission."

■ Considering the evidence discussed above, we hold that the district court correctly decided that appellants had not met their burden of proving that the assessor had improperly assessed the real property in Ada County as prescribed by the existing statutes. Realizing the significant limitations of time and staff and the magnitude of the effort that would be required to inspect and appraise each individual property in the county, to require a standard of absolute accuracy and uniformity would be futile. These ends are the ideal, and where the assessor deviates excessively relief will be granted. But, the presumption is that the assessor was correct. Appeal of Sears, Roebuck & Co., 74 Idaho 39, 256 P.2d 526 (1953), and errors in judgment are not sufficient to justify our granting a reduction in a taxpayer's assessment. C. C. Anderson Stores Co. v. State Tax Comm'n, 86 Idaho 249, 384 P.2d 677 (1963); Appeal of Sears, Roebuck & Co., supra.

■ Turning first to the assessor's practice of using multipliers to correct the 1965 assessment, we recognize that the practice of appraising considering only the cost of construction was held invalid in Boise Community Hotel, Inc. v. Board of Equalization, supra, and In re Farmer's Appeal, supra. The rationale for these decisions was that while cost of construction is one element of value, other factors must also have been considered. Among these are earning power where applicable, location, and cost. As to the residential property, the assessor sought to arrive at the full cash value, and we believe that the method which he employed was a reasonably accurate one with which to reach the result of approaching full cash value on the average throughout the county. Of 850 subdivisions in the county, the assessor examined at least three to five and in some cases as many as forty sales in approximately 300 subdivisions. Significantly, the Tax Commission study upon which appellants rely so heavily involved examination of the same sort of data, i. e., sales of real estate

4. Ch. 270, § 3 [1967] Idaho Session Laws 742. Effective January 1, 1967, Ch. 270, § 4 [1967] Idaho Session Laws 744. Repealed and new section added, Ch. 315 [1969] Idaho Session Laws 972.

in the various subdivisions, pertaining to 440 residential properties. The record does not disclose how many sales the assessor's office examined but if it were an average of only four per subdivision, the total would be 1200, nearly three times the number considered in the commission's study. The amount of deviation between the two studies is small, the difference being only 2.5 percent of the total. For these reasons, we sustain the district court's determination that appellants had not proven any actionable inaccuracy.

As to the remaining types of property, we agree with the district court that the evidence was insufficient to establish that it was undervalued for taxation purposes. Appellants' basic argument regarding the evaluation of commercial property and lots in the Boise City original townsite is that it was appraised by an erroneous method. However true this may be, the district court made no finding and appellants present no argument to this court as to the value of such property nor that it was in fact undervalued. It is not enough that the method of assessment be shown to be erroneous. Valuation fixed by the assessor must be shown to be " * * * manifestly excessive, fraudulent or oppressive; or arbitrary, capricious and erroneous resulting in discrimination against the taxpayer." C. C. Anderson Stores Co. v. State Tax Comm'n, supra; Appeal of Sears, Roebuck & Co., supra. Furthermore, since a substantial portion of the commercial property had had valuation fixed individually either by actual physical inspection or through recent adjustment by court appeal, the assessor had reliable information with which to compare the values placed on properties not actually inspected.

The difference in assessed value of the various types of agricultural land and the evidence of value as presented by appellants is significant. However, the evidence of the actual value of agricultural land seems to have been from the opinion testimony of one witness without disclosing actual inspection by him or the number of parcels upon which he was basing his testimony. For this reason we find that appellants' evidence of the value of farm land was inconclusive and that the district court was justified in not relying on it.

To be entitled to relief, the taxpayer has the burden by clear and convincing evidence to overcome the presumption that the assessor and Board of Equalization have performed their duties correctly. Abbot v. State Tax Commission, 88 Idaho 200, 398 P.2d 221 (1965); Appeal of Sears, Roebuck & Co., supra. The record before us amply supports the district court's determination that appellants did not meet this burden.

Judgment of the district court affirmed. Costs to respondent.

McQUADE, C. J., and McFADDEN, DONALDSON and SHEPARD, JJ., concur.