974 P.2d 21

**In the Matter of the Tax Appeal of HAWAII PRINCE HOTEL WAIKIKI CORPORATION, a Hawai'i corporation, Appellant,**

v.

**CITY AND COUNTY OF HONOLULU, Appellee**

**No. 20084**

Supreme Court of Hawai'i.

Feb. 10, 1999.

---

Mervyn M. Kotake (Benjamin M. Matsu-
bara and Jason M. Yoshida of Matsubara,
Lee & Kotake with him on the briefs) for
appellant.

Christine Kurashige, Deputy Corporation Counsel, on the briefs, for appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by KLEIN, J.

Taxpayer-appellant Hawaii[1] Prince Hotel Waikiki Corporation (hereinafter the "appellant" or the "taxpayer") appeals from the judgment of the tax appeal court affirming appellee City and County of Honolulu's (City) 1995–96 real property tax assessment for the Hawaii Prince Golf Course (HPGC). For the reasons set forth below, we affirm the City's base assessment of HPGC at $41,058,800. However, because the City's methodology for determining "the effect of the value of the golf course on the surrounding lands[,]" Revised Ordinances of Honolulu (ROH) 1990 § 8–7.4(a)(2),[2] otherwise known as "imparted value," is: (1) arbitrary and erroneous, (2) results in a lack of uniformity and inequality in golf course assessments, and (3) falls within the definition of a rule in Hawai'i Revised Statutes (HRS) § 91–1(4) (1993),[3] we vacate the City's total assessment of HPGC and order the City to reassess the taxpayer's property after it promulgates a rule establishing a methodology for imparted value,

pursuant to the rulemaking procedures in the Hawai'i Administrative Procedure Act (HAPA), HRS § 91–3 (1993).[4]

## I. BACKGROUND

On December 29, 1988, Seibu Hawaii, Ltd. purchased 270 acres of land located in 'Ewa, O'ahu from the Estate of James Campbell (Campbell Estate). Seibu Hawaii then transferred the property to Seibu Railway Company, which in turn conveyed the property to its subsidiary, the taxpayer. In 1991, the taxpayer completed construction of HPGC, which consists of a 27–hole golf course, a clubhouse, parking lots, tennis courts, and other related improvements. The course opened for play in 1992. Since 1994, HPGC has been registered with the City as a dedicated golf course.

In this case, taxation of HPGC requires an understanding of the course's relationship to the surrounding lands. On the mauka[5] side of HPGC is a 255–acre plot of land (hereinafter "mauka lands"). Approximately 140 acres of the mauka lands is owned by a developer, Gentry, which rezoned the property from agricultural to urban use for the purpose of development (hereinafter "Gentry

1. Trade names used in this opinion are reprinted in their official form which does not necessarily comport with traditional Hawaiian spelling.

2. *See infra* note 9.

3. *See infra* Part IV.B.2.

4. HRS § 91–3 provides in relevant part:

   **§ 91–3 Procedure for adoption, amendment or repeal of rules.** (a) Prior to the adoption of any rule authorized by law, or the amendment or repeal thereof, the adopting agency shall:
   (1) Give at least thirty days' notice for a public hearing. The notice shall include:
   (A) Either:
   (i) A statement of the substance of the proposed rule adoption, amendment, or repeal; or
   (ii) A general description of the subjects involved and the purposes to be achieved by the proposed rule adoption, amendment, or repeal; and
   (B) A statement that a copy of the proposed rule to be adopted, the proposed rule amendment, or the rule proposed to be repealed will be mailed at no cost to any interested person who requests a copy, together with a

   description of where and how the requests may be made; and
   (C) The date, time, and place where the public hearing will be held and where interested persons may be heard on the proposed rule adoption, amendment, or repeal.
   The notice shall be mailed to all persons who have made a timely written request of the agency for advance notice of its rulemaking proceedings, and published at least once in a newspaper of general circulation in the State for state agencies and in the county for county agencies.
   (2) Afford all interested persons opportunity to submit data, views, or arguments, orally or in writing. The agency shall fully consider all written and oral submissions respecting the proposed rule. The agency may make its decision at the public hearing or announce then the date as to when it intends to make its decision. Upon adoption, amendment, or repeal of a rule, the agency shall, if requested to do so by an interested person, issue a concise statement of the principal reasons for and against its determination.

5. Mauka is defined as "[i]nland, upland, towards the mountain[.]" M.K. Pukui & S.H. Ebert, *Hawaiian Dictionary* 242, 365 (6th ed.1986).

land"). The remaining 115 acres are adjacent to the golf course, owned by Campbell Estate and zoned for agricultural use.

A one hundred foot "buffer zone," created pursuant to the taxpayer's deed, separates HPGC from the mauka lands. The buffer zone limits the height of fences and vegetation within the zone to three feet and requires trees to be planted no closer than fifteen feet apart. As a condition of purchasing the property, the taxpayer's deed also required it to install extensive drainage structures on the property that would have the capacity to accept all water run off from the mauka lands.

Makai[6] of the golf course is a residential subdivision that existed prior to the construction of HPGC (hereinafter "makai subdivision"). A fence, a six-foot berm, and an "old canehaul road" separate the makai subdivision and HPGC. Other than the mauka lands and makai subdivision, HPGC is surrounded by undeveloped agricultural land.

In 1995, the City rendered its assessment of the land and buildings situated on the taxpayer's property as follows:

| Tax Year | Building Value | Land Value | Total Assessment |
|---|---|---|---|
| 1995 | $2,431,100 | $38,627,700 | $41,058,800 |

---

**6.** Makai is defined as "on the seaside, toward the sea, in the direction of the sea." Pukui & Ebert, *supra* note 5, at 225, 114.

**7.** HRS § 232–3 provides in relevant part:

> **Grounds of appeal, real property taxes.** In the case of a real property tax appeal, no taxpayer or county shall be deemed aggrieved by an assessment, nor shall an assessment be lowered or an exemption allowed, unless there is shown:
> . . . .
> (2) Lack of uniformity or inequality, brought about by illegality of the methods used or error in the application of the methods to the property involved, or
> . . . .
> (4) Illegality, on any ground arising under the Constitution or laws of the United States or the laws of the State (in addition to the ground of illegality of the methods used, mentioned in clause (2)).

**8.** ROH § 8–12.3 provides in relevant part:

> **Grounds of appeal—Real property taxes:** In the case of a real property tax appeal, no taxpayer shall be deemed aggrieved by an assessment, nor shall an assessment be lowered

The taxpayer filed a notice of appeal directly to the tax appeal court, alleging violations of HRS §§ 232–3(2) and –3(4) (1993)[7] and ROH §§ 8–12.3(1), –3(2), and –3(4).[8] Trial commenced on April 19, 1996.

At trial, both the City and the taxpayer's appraisers testified regarding their valuation of HPGC.

### A. The City Appraiser's Assessment of HPGC

The City appraiser, Richard Nathaniel (hereinafter "the City appraiser"), testified that he appraised the actual use of HPGC as a dedicated golf course using the cost approach method of appraisal in combination with the factors listed under ROH § 8–7.4.[9]

### 1. Cost approach

In calculating his assessment under the cost approach, the City appraiser estimated the raw land value and added it to the current development cost of constructing the golf course, less accrued depreciation.

The raw land value was determined by examining the sale of five different parcels of land, including HPGC, bought specifically for

---

or an exemption allowed, unless there is shown (1) assessment of the property exceeds by more than 10 percent of the market value of the property, or (2) lack of uniformity or inequality, brought about by illegality of the methods used or error in the application of the methods to the property involved, or . . . (4) illegality, on any other ground arising under the Constitution or laws of the United States or the laws of the state or the ordinances of the city in addition to the ground of illegality of the methods used, mentioned in clause (2).

**9.** ROH § 8–7.4 provides in relevant part:

> (a) Property operated and used as a golf course shall be assessed for property tax purposes on the following basis:
> (1) The value to be assessed by the director shall be on the basis of its actual use as a golf course rather than on the valuation based on the highest and best use of the land.
> (2) In determining the value of actual use, the factors to be considered shall include, among others, rental income, cost of development, sales price and, the effect of the value of the golf course on the value of the surrounding lands.

golf course use or partial golf course use.[10] The City appraiser then calculated a per hole and per acre unit figure for each transaction by dividing the sales price by the number of holes and acres on the property. Adjustments were made for weight factors,[11] market conditions, location, physical characteristics, and weather. The final raw land value for HPGC was then rounded to $9,927,700.

The City appraiser next calculated the current cost to develop the golf course by using golf course architect Robin Nelson's 1995 cost development figure, supplied by the taxpayer, estimated at $28,691,000. Nelson's report indicated that "the figures for earthmoving and lake lining were generally higher than they would normally be because ... [HPGC] had a governmental requirement to store all runoff drainage water onsite." Specifically, the elevated figures were due to the fact that the taxpayer "moved 1,100,000 cubic yards of earth, or 4,780 cubic yards per acre, not including topsoil, plus they lined 32 acres of lakes at a cost of $4,200,000." The City appraiser deducted $2,712,000 from Nelson's cost estimate for the extra earth movement, but no credit was given for the additional lake lining. Thus, the estimated development costs to construct the golf course were $25,979,000.

An additional fourteen percent ($3,637,100) was added to the estimated development costs because Nelson's estimate did not include other associated costs such as land costs, buildings or related paving, financial costs, off-site improvements, power, water development, insurance, overhead, architect's and engineer's fees, etc. Generally, the associated costs for most golf courses add approximately twelve percent. For HPGC, however, the associated costs were adjusted two percent upward because Arnold Palmer designed the course, and his fees alone averaged "at least one million dollars." The City appraiser also subtracted one percent for observed depreciation and about two percent for functional obsolescence to arrive at a total depreciated development cost of approximately $28,700,000.

Addition of the raw land value ($9,927,700), the depreciated development cost ($28,700,000), and the building value ($2,431,100) resulted in a final value estimate, under the cost approach, of $41,058,800. Because the City appraiser believed this figure was too high, he employed the market data approach in order to verify his cost approach calculations.

### 2. Market data approach

The market data approach compares the property being appraised with similar comparable property. See In re Tax Appeal of County of Maui v. KM Hawai'i, 81 Hawai'i 248, 251 n. 5, 915 P.2d 1349, 1352 n. 5, reconsideration denied, 81 Hawai'i 400, 917 P.2d 727 (1996) (describing the methodology for the market data approach). In applying this approach, the City appraiser collected data regarding four golf course sales: Mililani Golf Club (Mililani), Kapolei Golf Course (Kapolei), Royal Hawaiian Golf Club (Royal Hawaiian), and Waikele Golf Club (Waikele). He then adjusted the sale prices of the comparable properties to reflect differences between them and HPGC in terms of size, location, number of holes, physical characteristics, and climate. Using this information, the City appraiser concluded that HPGC's actual use value was either $1,416,400 per hole or $148,400 per acre. This figure was then applied to the number of holes (27) and acres (270) at HPGC for a value, under the market data approach, ranging from $38,242,800 to $40,068,000.

The City appraiser considered the cost approach as the more accurate estimate of value and set HPGC's base assessment at $41,058,000.

After completion of the City's assessment, the taxpayer requested that Nelson submit a new cost development estimate excluding the full value of the existing drainage structures

---

10. The five transactions involved were Maunawili, Kaneohe, Ewa Beach Golf Club, Ewa Plain, and Makakilo golf courses.

11. The City appraiser explained that the weight factor is used to "take care of the real big aberra-

tions in the prices paid or the market or the prices paid for the properties and how much you determine the reliability of each sale compared to the subject property."

and adjusting the figures for earthmovement and lake lining to the "usual and normal" amount. Nelson's new cost estimate, dated April 11, 1996 (hereinafter "1996 cost development estimate"), reduced the development cost from $28,691,000 to $20,057,360. The City appraiser rejected Nelson's 1996 cost development estimate because he believed it represented a "fictitious golf course" rather than HPGC.

### 3. Imparted value

Following HPGC's base assessment, the City appraiser considered "the effect of the value of the golf course on the surrounding lands," pursuant to ROH § 8–7.4(a)(2). This concept is otherwise known as "imparted value." In calculating imparted value, the City appraiser explained that he weighs the effect of the golf course on the surrounding properties and deducts such value from the assessed value of the golf course. Although this new methodology was not reduced to writing, the City appraiser testified that he had the standards "in his head." As applied to HPGC, the City appraiser classified the property as a "stand alone golf course" and deducted no imparted value from the final assessment.

### B. The Taxpayer's Assessment of HPGC

In contrast, the taxpayer's appraiser, Robert Hastings Jr., testified that he conducted two inspections of the property: (1) a review of comparable transactions for vacant commercial raw land value or transactions for completed golf courses; and (2) an examination of HPGC's income statements, including physical aspects, operating costs, and growth of costs. Hastings then used three different valuation methods to determine the market [12] value of HPGC: cost approach, two different tests within the income capitalization approach, and the market data approach.

### 1. Cost approach

Hastings's cost approach paralleled the City appraiser's methodology: calculating the raw land value, adding the development costs of the course, less accrued depreciation. Hastings's assessment, however, differed from the City appraiser's in that he utilized Nelson's 1996 cost development estimate reducing the initial cost of the course's construction by approximately $8.5 million. In Hastings's opinion, Nelson's 1996 cost development estimate was an "exact replica" of the course except for costs created by the deed restrictions. Hastings also considered two additional forms of depreciation that the City did not: external economic obsolescence and physical depreciation. According to Hastings, the total depreciation amounted to $19,590,000. Hastings arrived at a final estimated value, under the cost approach, of $15,800,000.

### 2. Income Approach

Differing from the City appraiser, Hastings employed two tests under the income approach: capitalization of stabilized net income and discounted cash flow analysis. Under the former approach, Hastings estimated the net operating income projected for 1997 at $1,363,892. He then used a capitalization rate of eight-and-a-half percent to estimate a final value of $16,050,000.

The latter discounted cash flow analysis projected HPGC's cash flow for the years 1995 through 2005, taking into consideration HPGC's past operations and prospective improvement in net income. Hastings estimated HPGC's net income at $8,598,177, multiplied by an internal rate of return of eleven-and-a-half percent, to arrive at a final value of $16,570,000, or $613,740 per hole.

### 3. Market data approach

Finally, Hastings employed the market data approach. His comparables included: Sheraton Makaha Golf Club, Makaha Valley Country Club, Mililani, Waikele, Kapolei, Makakilo Golf Course, and Royal Hawaiian. The sales price of each property was adjust-

---

12. Hastings assessed the property based on its fair market value. The City appraiser points out, however, that the property must be appraised on the basis of its actual use value, not its fair market value. The City appraiser testified that fair market value is determined according to property's "highest and best use," whereas actual use value is "measured ... for a specific purpose that the property can be used for[.]"

ed for various factors, including market conditions, location, topography, quality, water conditions, and course soil conditioning. After adjustments, Hastings's analysis resulted in a range of values from $445,681 to $746,111 per hole. The mean and median unit value were set at $586,571 and $558,333, respectively. Based on this analysis, Hastings deduced that the per hole value was $575,000, for a total value, under the market data approach, of $17,500,000. Unlike the City appraiser, Hastings believed that the market data approach was "the most appropriate approach in terms of viewpoint of potential buyers" and thus based his final assessment on the market data approach.

### 4. Imparted value

Testifying contrary to the City appraiser's opinion, Hastings opined that HPGC should have been credited for the value the course imparted to the surrounding mauka lands. According to Hastings, measurable imparted value is represented by the cost of the drainage system that HPGC was required to install. In Hastings's opinion, the value of the system may be transferred to the mauka lands through cost avoidance for future development. Hastings reasoned that future developers would thus benefit from HPGC's extensive drainage system.

### C. Trial Motions

During trial, the taxpayer filed a motion for partial summary judgment, challenging the City appraiser's failure to deduct the value that HPGC imparted to the surrounding lands. In support thereof, the taxpayer argued that the City appraiser's interpretation of ROH § 8–7.4 and his consultation of the American Institute of Appraisers' (AIA) books applying imparted value constituted illegal rulemaking contrary to HAPA and in violation of the equal protection clauses of the United States and Hawai'i Constitutions. The taxpayer later filed a second motion for summary judgment and/or directed verdict, claiming that the City appraiser's methodology in assessing the real property value of HPGC violated ROH §§ 8–7.1[13] and 8–12.3(4).

### D. Conclusion of Trial

After considering the evidence, the tax appeal court entered its findings of fact (FOF), conclusions of law (COL), and judgment in favor of the City. The court rejected Hastings's testimony and valuations, ruling that "the data and interpretation thereof to support [his] valuations are questionable and unpersuasive." With respect to the City appraiser, the court found that:

. . .

21. Mr. Nathaniel correctly determined the actual use value of the subject property as reflected in the real property tax assessment for tax year 1995–96.

22. The City correctly applied the methodology in its cost approaches and market data to the determination of value of the subject property.

23. There was no evidence of a lack of uniformity or inequality in the assessment of the subject property.

24. There was no evidence of illegality on any grounds in the assessment of the subject property.

25. The court finds Mr. Nathaniel's expert opinions herein to be more reliable and accurate than those of Mr. Hastings.

Accordingly, the court concluded that:

. . .

13. ROH § 8–7.1 provides in relevant part:
(a) The director of finance shall cause the fair market value of all taxable property to be determined and annually assessed by the market data and cost approaches to value using appropriate systematic methods suitable for mass valuation of properties for taxation purposes, so selected and applied to obtain, as far as possible, uniform and equalized assessments throughout the county; provided, that the val-

ue of land classified and used for agriculture shall be determined as provided in subsection (e)(1) of this section. In making such determination and assessment, the director shall separately value and assess buildings, and (2) all other real property, exclusive of buildings.
(b) So far as practicable, records shall be compiled and kept which shall show methods established by or under the authority of the director, for the determination of value.

3. Based upon the Court's finding that there was no evidence of a lack of uniformity or inequality or illegality in the assessment of the subject property and that the City has not valued the property at more than 110 percent of its market value, the Court concludes that under Section 8–12.1, ROH, Appellant is not aggrieved and the Court may not lower the assessed valuation contested by Appellant.

4. The City is required annually under Section 8–7.1(a), ROH, to assess total property value using "the market data and cost approaches to value using appropriate systematic methods suitable for mass valuation of properties of taxation purposes."

5. Because the subject property is a dedicated golf course, the factors listed in Section 8–7.4, ROH, must be considered in assessment of the subject property.

6. Under Section 8–7.4, ROH, there was no effect of the golf course on the value of the surrounding land for assessment purposes.

7. The City's tax assessment of the subject property does not discriminate against Appellant.

8. The City's methodology in conducting the assessment of the subject property does not constitute illegal rulemaking under Chapter 91, Hawai'i Revised Statutes.

The tax appeal court also denied the taxpayer's motions for partial summary judgment regarding imparted value and for summary judgment and/or directed verdict on the basis that the taxpayer failed to establish sufficient grounds to support its motions. Following entry of the tax appeal court's judgment, the taxpayer filed a timely notice of appeal.

## II. *STANDARDS OF REVIEW*

■ It is well settled that[,] in reviewing the decision and findings of the Tax Appeal Court, a presumption arises favoring its actions which should not be overturned without good and sufficient reason. The appellant has the burden of showing that the decision of the Tax Appeal Court was "clearly erroneous."

*In re Tax Appeal of Maile Sky Court Co., Ltd.,* 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997) (quoting *City and County of Honolulu v. Steiner,* 73 Haw. 449, 453, 834 P.2d 1302, 1306 (1992) (citation omitted)). A finding of fact is clearly erroneous when it is not supported by substantial evidence or "an appellate court is left with 'a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *In re Tax Appeal of Frank W. Swann,* 7 Haw.App. 390, 399, 776 P.2d 395, 401 (1989)).

■ Conversely, questions of law are reviewable under the right/wrong standard. *In re Maile Sky Court,* 85 Hawai'i at 39, 936 P.2d at 675 (citing *In re Tax Appeal of Fuji Photo Film Hawai'i, Inc.,* 79 Hawai'i 503, 508, 904 P.2d 517, 522 (1995)).

## III. *GENERAL PRINCIPLES OF REAL PROPERTY TAX VALUATION*

We have long recognized that "property valuation is not an exact science[.]" *In re Tax Appeal of Weinberg,* 82 Hawai'i 317, 324, 922 P.2d 371, 378 (1996). The "ultimate purpose of valuation, whether in eminent domain or tax ... proceedings is to arrive at a fair and realistic value of the property involved." *In re County of Maui,* 81 Hawai'i at 255, 915 P.2d at 1356 (quoting *Steiner,* 73 Haw. at 454–55, 834 P.2d at 1306). Our appellate courts have observed that "no method of mass valuation of properties for taxation assures absolute accuracy and uniformity." *In re Swann,* 7 Haw.App. at 399, 776 P.2d at 401 (quoting *Title & Trust Co. v. Board of Equalization, Ada County,* 94 Idaho 270, 486 P.2d 281, 288 (1971) (quotation marks omitted)). The same principle applies to golf courses. Neither tax authorities nor the courts have, as yet, arrived at settled or infallible rules or criteria by which to ascertain the actual value of golf course properties. It is in light of these established principles that we review HPGC's assessment.

## IV. *DISCUSSION*

■ On appeal, the taxpayer argues that the tax appeal court erred in concluding that: .

(1) the City's methods in assessing HPGC were properly applied and did not result in an overall lack of uniformity or inequality; (2) the City's methodology in determining imparted value did not constitute illegal rule-making, in violation of HAPA, HRS Chapter 91; (3) the City's assessment did not violate the equal protection clauses of the federal and state constitutions; and (4) the taxpayer did not establish sufficient grounds to grant its April 25, 1996 motion for partial summary judgment and May 10, 1996 motion for summary judgment and/or directed verdict.

As a preliminary matter, we note that, in valuing and assessing golf course property for the purpose of real property taxation, ROH § 8–7.4 dictates that the property is assessed "on the basis of its *actual use* as a golf course rather than on the valuation based on the highest and best use of the land." (Emphasis added.) Although no specific method is prescribed for determining the actual use value of a golf course, ROH § 8–7.4(a)(2) lists several factors to be considered including: rental income, cost of development, sales price, and the effect of the value of the golf course on the surrounding lands.

A careful review of the record shows that the City appraiser considered the cost of development, sales price, and imparted value in his assessment of HPGC in compliance with the guidelines set forth in ROH § 8–7.4(a)(2).[14] First, the City appraiser viewed the cost of development as "a portion of the cost approach" where the cost to build the golf course is added to the raw land value to obtain the golf course's actual use value. As such, the City appraiser employed the cost of development when he incorporated Nelson's 1995 cost of development figure in his cost approach calculation. Second, the City appraiser took into consideration HPGC's sales price as being included in the market data approach, which "survey[ed] the market to determine if there ha[d] been a sufficient number of recent voluntary sales of similar property to provide dependable information as to the selling rate of 'comparable proper-

ty.'" *In re County of Maui*, 81 Hawai'i at 251 n. 5, 915 P.2d at 1352 n. 5 (quoting *Northerly Centre Corp. v. County of Ramsey*, 311 Minn. 335, 248 N.W.2d 923, 925 n. 2 (Minn.1976)). Finally, after examining the surrounding lands, the City appraiser concluded that the golf course had no effect or benefit on the value of the surrounding properties.

In light of these considerations, we hold that the City appraiser complied with the factors listed in ROH § 8–7.4. The taxpayer's contentions are therefore purely evidentiary, relating to the City appraiser's application of the cost and market data approaches, as well as imparted value. We address these arguments seriatim.

### A. The City Appraiser's Application of the Cost and Market Data Approaches Was Not Illegal, Arbitrary, Or Erroneous.

#### 1. Cost approach

The taxpayer asserts that the City appraiser's valuation under the cost approach was inaccurate and flawed because: (1) the City appraiser used the wrong cost estimates to determine the cost of development figure; (2) the raw land value did not accurately reflect the substantial decrease in the value of other commercial properties on Oʻahu between 1989 to 1995; and (3) the City appraiser failed to make deductions for economic and functional obsolescence. Although the taxpayer offered evidence to discredit the City's proffered valuation, we hold that the tax appeal court's findings in favor of the City are supported by substantial evidence in the record.

It is undisputed that the taxpayer supplied the City with Nelson's 1995 cost estimate for calculation of HPGC's taxes. Following the City's high tax assessment of HPGC, the taxpayer requested a second cost estimate from Nelson. The second cost estimate excluded the full value of the existing drainage system and made adjustments for the "normal and usual amount" of earthmovement

---

**14.** Because HPGC did not generate rental income from the property, the City appraiser did not consider it in his assessment.

and lake lining. Using Ewa Beach International Golf Course [15] for comparative purposes, Nelson reduced the figure for mass excavation of 600,000 cubic yards of earth and assumed that only two acres of lakes needed to be lined for irrigation. After making these adjustments, Nelson's 1996 estimated cost of development was approximately $8.5 million less than his 1995 cost of development estimate. Hastings claimed that this figure reflected the costs for an "exact replica" of the course, excluding the cost of the drainage system.

Contrary to the taxpayer's belief, the construction of the golf course did not entail the "usual and normal" costs associated with building a golf course. Specifically unique to the property, the conditional use permit and the taxpayer's deed both required the course to provide on-site storage for the runoff of all drainage water. The taxpayer knew of these restrictions upon purchasing the property and was fully aware that additional costs would have to be incurred in order to complete construction of the course. Moreover, Nelson's 1995 estimated cost of development consisted of the actual construction costs used to build the course, including the costs of moving 1,100,000 cubic yards of earth and lining 32 acres of lakes, at the cost of $4,200,-000. Without these cost considerations, Nelson's estimated 1996 cost of development did not accurately represent the costs that would be incurred to construct an "exact replica" of HPGC. Accordingly, we hold that substantial evidence supported the tax appeal court's finding that "the City correctly applied the methodology in its cost approach[ ] . . . to the determination of value of the subject property."

### 2. Market data approach

The taxpayer further claims that the City appraiser's selection of comparable properties under the market data approach was flawed because the properties "did not fall within the [criteria] of a dependable market comparable."

Where evidence of a comparable sale or lease is offered, the trial judge may, in his [or her] discretion, admit or exclude it considering such factors as time of the transaction, size, shape and character of the comparable land, and whether there has been any enhancement or depression in value.

*In re Weinberg,* 82 Hawai'i at 327, 922 P.2d at 381 (quoting *State v. Heirs of Halemano Kapahi,* 48 Haw. 101, 112–13, 395 P.2d 932, 939 (1964)); *see also State v. Dillingham Corp.,* 60 Haw. 393, 411, 591 P.2d 1049, 1060 (1979); *State v. Martin,* 54 Haw. 167, 170, 504 P.2d 1223, 1225 (1973).

■ In the case at bar, the City appraiser obtained market sales information from four golf course transactions: Mililani, Kapolei, Royal Hawaiian, and Waikele. Property sales were chosen after 1986 to ensure their recency, and adjustments were made for factors such as market condition, climate, and physical characteristics in order to compensate for deficiencies in the comparable properties. Given the special nature of golf course properties, we recognize that it is possible to find fault with every property chosen as a comparison. Nevertheless, the tax appeal court accepted the City appraiser's assessment as "more reliable and accurate" than that of the taxpayer's appraiser, whose valuations were found to be "questionable and unsupportive."

■ As a general rule, determining the credibility of the witnesses and weight of the evidence are matters within the sound discretion of the tax appeal court. *See In re Weinberg,* 82 Hawai'i at 327, 922 P.2d at 381 ("[W]eight given to evidence is within the province of the tax appeal court, which will not generally be disturbed on appeal."); *State v. Pioneer Mill Co., Ltd.,* 64 Haw. 168, 179, 637 P.2d 1131, 1139 (1981) ("Experts' opinions vary and the competence, credibility and weight of their testimony is exclusively in the province of the [trier of fact].") (Quoting *Territory v. Adelmeyer,* 45 Haw. 144, 163, 363 P.2d 979, 989 (1961)). The tax appeal court thus acted well within its discretion to credit the City appraiser's tax assessment. We therefore hold that there was no abuse of discretion in the tax appeal court's

---

**15.** Nelson stated that Ewa Beach International "had no runoff storage requirement, moved some 300,000 cubic yards on 135 acres, excluding top-soil (or 2,200 cubic yards per acre), and was not required to line any of their lakes."

admission of comparable sales evidence presented by the City appraiser and affirm the City's base assessment of HPGC at $41,058,800.

B. *The City's Methodology Employed to Determine Imparted Value Was Illegal, Arbitrary, and Erroneous, Resulting in a Lack of Uniformity, and Inequality in Golf Course Assessments, and Was in Violation of HAPA Rulemaking Procedures.*

As noted earlier, ROH § 8–7.4(a)(2) expressly permits tax appraisers to consider "the effect of the value of the golf course on the value of the surrounding land[,]" commonly referred to as "imparted value." As we understand this concept, properties surrounding a golf course receive a benefit in terms of higher property valuations due to their proximity to the golf course. The valuation of the golf course is, accordingly, credited for the higher values it imparts to the surrounding properties on a dollar-for-dollar basis.

Here, the taxpayer challenges the tax appeal court's COL No. 6 that, "[u]nder Section 8–7.4, ROH, there was no effect of the golf course on the value of the surrounding land for assessment purposes[,]" i.e., that HPGC was not entitled to a credit against its tax assessment for imparted value. Essentially, the taxpayer raises two arguments: (1) the City appraiser's methodology for determining imparted value was illegal, arbitrary, erroneous, and resulted in a lack of uniformity and inequality in golf course assessments; and (2) the City illegally adopted and applied a methodology for imparted value, in violation of HAPA rulemaking procedures.

1. *The City appraiser's methodology for imparted value was arbitrary, and erroneous, resulting in a lack of uniformity and inequality in golf course assessments.*

■ As to the taxpayer's first argument, our review of the record indicates that, in 1985, the City created procedural guidelines interpreting the factors listed ROH § 8–7.4, including imparted value. After several adverse rulings by the tax appeal court,[16] the City appraiser testified that he stopped using the guidelines in 1994 because it caused him "too much heartache and too much problems." Thereafter, no written rules or guidelines were used to determine imparted value. The City appraiser claimed, however, to have the standards "in his head." Notwithstanding the absence of written rules or guidelines, the City appraiser's methodology for calculating imparted value is illustrated in imparted value credits given to other O'ahu golf courses.

For instance, the inequality of HPGC's tax assessment is demonstrated by a comparison of per hole values of other courses:

| Course | Assessed Per Hole Value |
|--------|------------------------|
| HPGC | $ 1,520,696 |
| Kapolei | $ 1,414,883 |
| Waikele | $ 1,303,094 |
| O'ahu Country Club | $ 831,944 |
| Ko Olina | $ 796,494 |
| Waialae | $ 790,167 |

Source: City and County of Honolulu Dept. of Taxation. In light of these figures, there are appreciable discrepancies among the assessments against HPGC and other golf courses.

The taxpayer also points to the real property tax assessments of the Ko Olina and Waialae golf courses to illustrate the City's inconsistent application of imparted value to the different properties. With regard to Ko Olina, the City appraiser credited $6,000,000 to the course for the value it imparted to several *proposed* hotel sites surrounding the course. At the time of the assessment, only one hotel had been built "across the street" from the course, and it was generally believed that the other proposed hotels would not be constructed. The City appraiser testi-

---

16. *See* Administrative Memorandum No. 13, dated August 14, 1985 (repealed by the tax appeal court's October 22, 1990 order granting motion for summary judgment in *In the Matter of the Tax Appeal of Pearl Country Club (Honda Kaihatsu Kogoyo Kabushiki Kaisha)*, Nos. 2636 and 2637);

Memorandum from Richard Nathaniel, dated January 1, 1992 (repealed by the tax appeal court's May 2, 1994 order granting motion for summary judgment in *In the Matter of the Tax of Pearl Country Club (Honda Kaihatsu Kogoyo Kabushiki Kaisha)*, Nos. 2898 and 2899).

fied that, for Ko Olina, he made a determination of imparted value based on estimates from the Hawai'i Visitors Bureau, assumptions regarding hotel room rates, and estimates of the percentage of golfers who would *possibly* stay at the hotels. Furthermore, the City appraiser stated that a significant portion of the $6,000,000 credit was based on the deed restrictions for "reserved tee times" for golfers staying at the hotel and the proposed hotels.

As for the Waialae golf course, the City appraiser calculated the value imparted to the course using "premiums" from the residences and hotel surrounding the property. For houses adjacent and abutting the course, the City appraiser conducted a "mass appraisal," comparing the market value of several homes surrounding the course with the market value of homes that were not adjacent to the golf course. He testified that he calculated the difference in values, arrived at a "benchmark," and deducted twenty-five to thirty percent from Waialae's base assessment. The City appraiser also credited the course for the value of hotel room views, which was imparted to the Kahala Mandrin Oriental Hotel, bordering the Waialae Country Club. At first glance, Ko Olina and Waialae appear to be similar. However, unlike Ko Olina, there is a hotel adjacent to the golf course at Waialae, and it appears that the Kahala Mandarin Oriental Hotel received a tangible economic benefit for which imparted value could be calculated.[17]

Based on these illustrations, we cannot discern any coherent method by which the City determines imparted value. No clear definition of imparted value exists in either agency rules or regulations, ROH § 8–7.4, or in any relevant legislative history. Nevertheless, the City appraiser proceeded to arbitrarily credit various O'ahu golf courses with imparted value on a case-by-case basis, taking into account factors such as view, pres-

tige, open space, and reserved tee times. Inasmuch as these factors are subjective, inconsistent, and arbitrary, we are left with the conclusion that not only is the City's methodology for determining imparted value questionable, but it also clearly results in a lack of uniformity and inequality in golf course assessments.

2. *The City's methodology for calculating imparted value falls within the definition of a rule, according to HRS § 91–1(4), and should have been promulgated pursuant to HAPA rulemaking procedures in HRS § 91–3.*

The taxpayer next argues that the City appraiser's adoption of an unwritten methodology for ascertaining imparted value violates HAPA's rulemaking requirements, as set forth in HRS § 91–3, *see supra* note 4. According to the taxpayer, by having unclear guidelines as to what constitutes imparted value, the City appraiser is given "unbridled discretion" to apply "his own personal standards as to what factors are applicable and under what circumstances." We agree.

Under ROH § 8–1.3(k), the director of the Department of Finance is authorized to

promulgate such rules and regulations as [he or she] may deem proper, and to effectuate the purposes for which the director's department is constituted, and to regulate matters of procedure by or before the director pursuant to the provisions of HRS Chapter 91.

HRS § 91–1(4) (1993) defines a rule as an:

[A]gency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal manage-

---

17. If imparted value were to be calculated for Waialae, the value could be obtainable from a simple room count of the number of rooms with a view of the golf course. It is then possible to establish the difference in room rates based on golf course views versus non-golf course views. These views are the selling points of hotels and most likely recorded by each hotel in their room rate lists. Finally, room occupancy rates provide

a means of calculating on average how many days a year golf course view rooms are occupied. By taking the difference in room rates and multiplying the result by the number of rooms with golf course views and then by the average occupancy rate, it is possible to obtain a quantified value imparted by the golf course to the existing hotel.

ment of an agency and not affecting the private rights of or procedures available to the public[.]

Turning to the instant case, the City appraiser's methodology used to determine the deduction for imparted value was clearly a "rule" within the meaning of HRS § 91–1(4). Indeed, the City appraiser candidly admitted that his methodology for determining imparted value was based on his *interpretation* of the factors contained in ROH § 8–7.4(a)(2). He also acknowledged that he determined how and when differing factors apply in order to credit a golf course for imparted value. This being the case, the City appraiser's arbitrary methodology undoubtedly affects the assessed value of the golf course and the future assessments of all golf course owners. We therefore hold that the City appraiser's unwritten methodology for determining imparted value falls within the definition of a rule for the purposes of HRS § 91–1(4). The City must therefore follow the HAPA rulemaking procedures set forth in HRS § 91–3 prior to applying imparted value deductions toward golf course assessments. Otherwise,

> the affected public cannot fairly anticipate or address the procedure as there is no specific provision in the statute or regulations which describe[s] the determination process. The public and interested parties are without any firm knowledge of the factors that the agency would deem relevant and influential in its ultimate decision. The public has been afforded *no* meaningful opportunity to shape these criteria that affect their interest.

*Aluli v. Lewin,* 73 Haw. 56, 60, 828 P.2d 802, 804, *reconsideration denied,* 73 Haw. 625, 831 P.2d 935 (1992) (quoting *613 Corp. v. New Jersey Div. of State Lottery,* 210 N.J.Super. 485, 510 A.2d 103, 112 (1986)). Without established written standards, golf course owners will never know whether their assessments were determined fairly and uniformly. Therefore, the judgment of the tax appeal court must be vacated. We further order the City to promulgate a rule defining a methodology for ascertaining imparted value and to reassess the subject property accordingly.

Because of the foregoing analysis, we do not reach the taxpayer's third contention that the City's application of imparted value violated the equal protection clauses of the United States and Hawai'i Constitutions.

C. *The Tax Appeal Court Properly Denied Taxpayer's Motions For Summary Judgment and/or Directed Verdict.*

█ The taxpayer's final argument is that the tax appeal court erred in denying its motions for summary judgment and/or directed verdict on the issue of imparted value. This argument, however, is wholly without merit.

█ The function of a motion for summary judgment is "to determine whether an issue set forth in the pleadings is in fact in dispute and, if not, to eliminate any portion of the case *for which trial is not required."* J. Friedenthal, M. Kane & A. Miller, *Civil Procedure: Summary Judgment* § 9.1, at 433 (1985). Put differently, a motion for summary judgment is used as a means to "avoid useless trials, and at the same time achieve a final determination on the merits ... [in order to] simplify trial or better prepare for trial." *Id.* at 434–35; *see also* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Summary Judgment* § 2712, at 564–67 (1983) (stating that a summary judgment motion is "intended to prevent vexation and delay, improve the machinery of justice, promote the expeditious disposition of cases, and avoid unnecessary trial when no genuine issue of fact have been raised") (footnotes omitted).

Here, HPGC raised its motions for summary judgment *during* trial. The motions were not heard or disposed of until after the close of the evidence in the case. Inasmuch as the tax appeal court delayed ruling on the motions until the close of the parties' evidence, HPGC's motions for summary judgment and/or directed verdict were moot and therefore properly denied.

## V. *CONCLUSION*

Based on the foregoing reasons, we affirm the City's base assessment of HPGC at $41,-

394

058,800. We hold, however, that because the City employed an illegal, arbitrary, and erroneous methodology for calculating imparted value, the final assessment of HPGC lacked uniformity and equality. We further hold that the City's methodology constitutes a rule within the meaning of HRS § 91–1(4) and therefore should have been promulgated pursuant to the rulemaking procedures prescribed in HRS § 91–3. Inasmuch as the City failed to promulgate such a rule, we vacate the City's total assessment of HPGC and remand the case for further proceedings consistent with this opinion.